IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ANGELA TORRES,** | Case No. 3:17-cv-1270-AC |
| Plaintiff, | *EX PARTE* **TEMPORARY RESTRAINING ORDER** |
| v. | |
| **ALIREZA ZAMANIZADEH, a/k/a ALI ZAMANI,** an individual, and **ADULT CARE SEARCH,** a foreign non-profit corporation, | |
| Defendants. | |

**Michael H. Simon, District Judge.**

This matter comes before the court on Plaintiff's *ex parte* motion for a temporary restraining order, and order to show cause why a preliminary injunction should not issue, to restrain Defendants from any and all activity resulting in the expenditure, encumbrance, or other disposition of funds or real property that may be traced back to Plaintiff.

Plaintiff filed this case on February 21, 2017, in Clark County Superior Court in the State of Washington, alleging state court claims for fraud and unjust enrichment. Defendants removed the case to this Court on August 15, 2017. Plaintiff alleges that Defendant Alireza Azmaniadeh ("Zamani") fraudulently induced Plaintiff to temporarily transfer money and one piece of real property to a charitable organization owned by Zamani—Defendant Adult Care Search

PAGE 1 – *EX PARTE* TEMPORARY RESTRAINING ORDER

("ACS")—and to sign a power of attorney authorizing Zamani to engage in real estate transactions on Plaintiff's behalf. Plaintiff further alleges that Zamani then refused to return those monetary and real propery assets, and, unknown to Plaintiff, transferred a second piece of real property out of Plaintiff's name and into ACS's name using the power of attorney and then took a cash-out mortgage on that property. Plaintiff further alleges that Zamani transferred much of Plaintiff's assets out of ACS through cash withdrawals and transfers to Zamani's for-profit business. After consideration of the record, the Court finds this motion appropriate for decision *ex parte*. In addition, for the reasons discussed below, the Court grants Plaintiff's motion for a temporary restraining order.

## STANDARDS

### A. Temporary Restraining Orders Generally

In deciding whether to grant a motion for temporary restraining order ("TRO"), courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32

(9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

**B. *Ex Parte***

Under Rule 65 of the Federal Rules of Civil Procedure:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1). There is a "very narrow band of cases" in which a TRO should be granted *ex parte*. *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006). In order to justify an *ex parte* TRO based on allegations that a defendant would further commit fraudulent behavior such as disposing assets, a plaintiff must show that the defendant "would have disregarded a direct court order and disposed of the [assets] within the time it would take for a hearing and must support such assertions by showing that the adverse party has a history of disposing of evidence or violating court orders or that persons similar to the adverse party have such a history." *Id.*

## DISCUSSION

**A. *Ex Parte* Consideration**

Plaintiff provides specific facts supporting her request for an *ex parte* TRO. Plaintiff filed her own declaration, attesting to the following facts: (1) Zamani used his personal relationship

PAGE 3 – *EX PARTE* TEMPORARY RESTRAINING ORDER

with Plaintiff to induce her to transfer to ACS money and assets and to sign a power of attorney granting Zamani authority over real estate transactions; (2) in June 2016 Plaintiff transferred $290,000 from her retirement account to ACS and transferred her Washington residence via quitclaim deed to ACS; (3) Plaintiff never intended to permanently donate those assets to ACS or to give them to Zamani; (4) Zamani convinced Plaintiff to transfer those assets to Zamani temporarily to shield them during Plaintiff's divorce proceedings and Zamani promised he would return them to Plaintiff; (5) Plaintiff nonetheless reported the assets during her divorce proceedings; (6) Zamani represented to Plaintiff that he has foreign bank accounts and assets and companies abroad; (7) Plaintiff repeatedly requested the return of her real property and money and Zamani would indicate his willingness to meet and do so and then not show up or otherwise stall; (8) Zamani finally stated that the money and real property was a "donation" to ACS and sent a donation receipt in February 2017, nearly eight months after the purported donation; (9) Plaintiff was awarded a piece of real property in Bend, Oregon as part of her divorce and in November 2016 Zamani asked her for the address of the property so he could ensure that there were no liens on the property; (10) on February 15, 2017, Zamani used the power of attorney he had obtained from Plaintiff to transfer the Bend, Oregon property to ACS and then obtained a $300,000 cash-out mortgage on the property; and (11) Plaintiff was unaware of the transfer of the Bend, Oregon property and subsequent mortgage and did not learn about it until an investigation was conducted by the State of Oregon into ACS. Plaintiff attached numerous exhibits, including text messages and emails between her and Zamani, the power of attorney, the quit claim deeds, the money transfers, and the Trust Deed for the mortgage on the Bend property, supporting Plaintiff's factual assertions.

Plaintiff also submits the declaration of Frank M. Najar, an investigator with the Oregon Department of Justice's Charitable Activities Section. In that document, Mr. Najar states that: (1) he investigated ACS and concluded that ACS does not perform any charitable activities; (2) 86 percent of ACS's funds deposited between February 2014 and February 2017 came from Plaintiff; (3) the money taken from Plaintiff was used for Zamani's personal benefit and not for any charitable purpose; (4) he noted the $300,329.12 deposit into ACS's account and when asked for documentation relating to the deposit discovered the fact that it was from a cash-out mortgage on Plaintiff's Bend, Oregon property; (5) of the $590,329.12 taken from Plaintiff and deposited into ACS's bank account, Zamani withdrew at least approximately $142,000 in cash, without explanation for how that cash was spent; and (6) of the $590,329.12 taken from Plaintiff and deposited into ACS's bank account, Zamani transferred at least approximately $338,700 from the ACS bank account and into the bank account of Zamani's for-profit company, ACareOption.com, whereas Zamani transferred only approximately $56,000 back from ACareoption.com to ACS.

Finally, Plaintiff submits the declaration of her counsel, who testifies that he has not conferred with opposing counsel and has not provided notice of this motion because he is concerned that if notice were given Zamani would likely attempt to move, withdraw, spend, encumber, or dispose of Plaintiff's remaining cash and real estate assets under Defendant Zamani's ownership or control, or under ownership or control of Defendant ACS or Defendant Zamani's ACareOption.com, Inc. Plaintiff's counsel notes that Zamani has demonstrated his disregard for courts by encouraging Plaintiff to shelter her assets in her divorce, still has Plaintiff's power of attorney in his possession, and has demonstrated that he will dispose of Plaintiff's assets improperly by transferring title to Plaintiff's Bend property and taking a cash-

out mortgage without Plaintiff's knowledge. Counsel further points out that Zamani has stated that ACS owns the assets and can do with them whatever it wants and has represented that he has bank accounts and assets in foreign countries, making it a viable risk that he can transfer Plaintiff's assets outside the country.

Plaintiff also asserts that upon information and belief, Defendants are not making the mortgage payments on the mortgages they have taken out on Plaintiff's properties. Thus, Plaintiff is at risk of losing her real property.

The Court finds that this case falls within the "narrow" exception supporting entry of an *ex parte* TRO. As discussed below, the Court finds that Plaintiff has demonstrated the *Winter* factors—this includes the a likelihood of success on the merits of proving fraud and unjust enrichment. The State of Oregon has concluded that Zamani has created a charitable organization that has not been used for charitable purposes but instead has been used for Zamani's personal gain, and that Zamani used this charitable organization to take Plaintiff's money and use it for Zamani's personal purposes. There is also evidence that in addition to running a fraudulent charity, Zamani has strategized how to shelter assets from court proceedings, has international bank accounts and assets, has dual citizenship in the United States and Iran, and has dissipated more than $425,000 of Plaintiff's assets to date. Although Plaintiff did not move for TRO immediately upon filing her lawsuit, and delay is a factor in considering irreparable harm (which is a necessary finding for an *ex parte* TRO), at that time Plaintiff was unaware that Zamani had transferred Plaintiff's Bend, Oregon property to ACS and took the cash-out mortgage. It is not clear when Plaintiff became aware of this fact, but it was discovered by the Oregon investigator sometime after he interviewed Zamani on July 27, 2017. Thus, the Court does not find that Plaintiff engaged in an unreasonable delay warranting denial of her *ex parte* motion.

Courts have found a likelihood of irreparable harm and a need of no notice and entered *ex parte* TROs under similar, or less compelling, facts than are present in this case. *See Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 2 (2d Cir. 1979) (*ex parte* TRO was appropriate because if defendant knew he "was about to be enjoined from continuing his illegal enterprise, he would immediately transfer his inventory to another counterfeit seller, whose identity would be unknown to [plaintiff]"); *Kyko Glob., Inc. v. Prithvi Info. Sols., Ltd.*, 2013 WL 12173381, at *3 (W.D. Wash. June 19, 2013) ("The evidence indicates Defendants have engaged in a pattern and practice of creating fictitious entities for the appearance of imitating legitimate business transactions and companies. Given this conduct, the Court finds irreparable injury would result if the status quo is not maintained. *King v. Saddleback Junior College Dist.*, 425 F.2d 426 (9th Cir. 1970). Further, because the relief sought by Plaintiffs entirely concerns money, the dissipation of Defendants' funds would render further prosecution of the case useless."); *Chong's Produce, Inc. v. Meshaal*, 2009 WL 3298175, at *1 (N.D. Cal. Oct. 9, 2009) (granting an *ex parte* TRO where the plaintiff stated that the defendant initially paid the plaintiff's bills, stopped paying, and was perpetually unavailable to the plaintiff but continued to do business with other vendors, and the plaintiff's counsel declared that the defendant "appears to be avoiding Plaintiff and to be experiencing financial problems"); *also see generally Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009) (noting that "[a] party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted"); *In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1480 (9th Cir. 1994) (noting that a district court can enjoin a defendant where the "defendant has engaged in a pattern of secreting or dissipating assets to avoid judgments"); *Total Access Payments, Inc. v. Maximum Bus. Innovations, Inc.*, 2010 WL 11552998, at *3 (C.D. Cal. July 29, 2010)

(explaining that "[t]he Ninth Circuit decisions reviewing ex parte TROs examine whether the plaintiff has sufficiently shown that a defendant's 'prior conduct establishes a likelihood that in the absence of an asset freeze and accounting, Plaintiffs will not be able to recover the improperly diverted funds and will thus be irreparably harmed'" and that "[o]nly when the applicant produces evidence of past misconduct threatening future dissipation of assets may an *ex parte* TRO freezing the defendant's assets issue" (quoting *Johnson*, 572 F.3d at 1085 and citing *In re Focus Media Inc.*, 387 F.3d 1077, 1086 (9th Cir. 2004); *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003); *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236-37 (9th Cir. 1999)). Accordingly, the Court finds that considering the motion *ex parte* is warranted in this case.

**B. *Winter* Factors**

   **1. Likelihood of Success on the Merits**

The Court finds that Plaintiff has shown a likelihood of success on the merits of her fraud and unjust enrichment claims. Plaintiff transferred $290,000 of her retirement funds to ACS in two transactions, one on June 13, 2016 and one on June 22, 2016. Plaintiff executed a quitclaim deed transferring her Washington property to ACS on June 14, 2016.

Plaintiff claims that these transfers were intended to be temporary and that Zamani promised to return the money and property to Plaintiff. Plaintiff claims that she relied on Zamani's representations that the assets would be returned in transferring them and in signing the power of attorney. The text messages submitted by Plaintiff support Plaintiff's claims. When Plaintiff makes requests to Zamani regarding the return of her money and property, Zamani responds regarding setting meeting times or times to speak on the telephone, or chastising Plaintiff for putting such information in writing. Zamani does not, however, respond that Plaintiff is incorrect in her assumption that the transfers were temporary and were, instead,

PAGE 8 – *EX PARTE* TEMPORARY RESTRAINING ORDER

actually permanent donations to ACS. The latter response would be expected if Zamani had not made representations that the assets would be returned and instead had believed the transfers to be charitable donations. Further, ACS did not send a "donation" receipt to Plaintiff until February 2017, when Plaintiff became more forceful in her demands for the return of the assets and the relationship between the parties deteriorated. If Zamani and ACS believed Plaintiff's June 2016 transfers were charitable donations at the time made, it is expected that a donation receipt would have been issued at that time.

Moreover, the investigation by the State of Oregon supports Plaintiff's claims. The State concluded that ACS is not a genuine charity, that 86 percent of all its revenues from February 2014 through February 2017 was the approximately $590,000 that came from Plaintiff's assets, and that more than $425,000 of those funds was used by Zamani for his personal gain. This shows that Zamani did not genuinely believe that the transfers from Plaintiff were contributions to a charity, to be used for charitable purposes.

Plaintiff also testifies that Zamani told her she had to sign a power of attorney in order to quitclaim Plaintiff's Washington property to ACS. This statement was false and the Court finds that Plaintiff has shown a likelihood of success that Zamani knew it was false at the time it was made. In his text messages Zamani repeatedly represents his expertise in financial and real estate matters. It is a reasonable inference that he would know that Plaintiff could quitclaim the property without signing a power of attorney to Zamani, particularly because Zamani did not sign the quitclaim deed and thus the power of attorney was irrelevant to that transaction. The

power of attorney was only relevant if Zamani intended to conduct other real estate transactions in Plaintiff's name, which he later did with respect to Plaintiff's Bend, Oregon property.[1]

### 2. Irreparable Harm

The analysis of irreparable harm and whether an *ex parte* TRO should issue are intertwined because in order to fall within the narrow exception for an *ex parte* TRO irreparable harm must necessarily be present. *See* Fed. R. Civ. P. 65(b)(1) (providing that an *ex parte* TRO can only issue where "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition"). Because the Court has found that the motion is appropriate for *ex parte* consideration, the Court has already found a likelihood of irreparable harm.

### 3. Balancing the Equities

In weighing equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). Granting the injunction would freeze Plaintiff's remaining assets in the possession of Defendants. The injunction also freezes the bank account of ACS, which consists primarily of Plaintiff's assets, and two accounts of ACareOption.com, Inc., in which the state of Oregon investigation found a significant amount of Plaintiff's funds were transferred.

The potential harm to Plaintiff in not issuing an injunction has been discussed above. Granting the injunction may harm Defendants because they would not have access to Plaintiff's remaining assets in their possession or control. The Court finds that this potential for harm is

---

[1] At this time, Plaintiff has not amended her complaint to add any allegations relating to the Bend, Oregon property and so the Court does not consider the likelihood of success on any claim related to Defendants' alleged conduct relating to this property.

PAGE 10 – *EX PARTE* TEMPORARY RESTRAINING ORDER

negligible, however, because Plaintiff has a likelihood of success in proving that her assets were never intended to go to Defendants on a permanent basis. Further, if she fails to so prove, then Defendants will have access to her assets when the TRO is lifted or, if a preliminary injunction is granted, when this case ends.

The injunction may harm ACS because its bank account will be frozen. This is harmful, but the harm is tempered by the State of Oregon's findings that ACS is a fraudulent charity, does not perform any charitable activities, and its funds have only been used for Zamani's personal use.

The TRO may also harm ACareOption.com, because two of its accounts would be frozen. These are accounts into which a significant amount of Plaintiff's funds were transferred.

The Court finds that the potential harm to Defendants and ACareOption.com, on balance, is outweighed by the likely harm to Plaintiff if an injunction is not issued. As discussed above, Zamani used Plaintiff's power of attorney after the parties' relationship deteriorated, without Plaintiff's knowledge, to transfer ownership of Plaintiff's Bend property and take a cash-out mortgage. Plaintiff is possibly facing losing her real property. Zamani has also used his for-profit corporation ACareOption.com to take money from his purported charity and has taken significant cash out of his purported charity. Given Zamani's dissipation of Plaintiff's assets, strategization to avoid court proceedings, and representations of his international bank accounts, assets, connections, and citizenship, the potential harm facing Plaintiff is significant. *Cf. Kyko*, 2013 WL 12173381, at *4 ("A balancing of the hardships weighs in favor of [Plaintiff]. . . . Prohibiting Defendants from transferring or dissipating funds without Court approval—at least until they can be heard on the matter in the next ten days—is not a burdensome condition given

that Defendants were not wholly engaged in a legitimate, lawful business. Thus, the risk weighs more heavily in favor of Plaintiffs.").

Moreover, if Defendants or ACareOption.com want access to the frozen assets they will have the opportunity to post an appropriate bond. The TRO essentially preserves the status quo and provides the opportunity for Plaintiff to have her assets returned if she prevails. The Court has found that Plaintiff has a likelihood of success in proving that her assets were never intended to be a donation to ACS, and certainly not intended to be given to ACareOption.com, and thus freezing these accounts preserves Plaintiff's funds so that they cannot be further dissipated.

### 4. Public Interest

When determining the public interest, a court "primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). Granting the injunction would not harm the public interest. There is, however, public interest in preventing ongoing fraudulent behavior and dissipation of fraudulently-obtained funds. *See Panyanouvong v. Aphay*, 2014 WL 2986507, at *6 (W.D. Wash. July 1, 2014) ("The public interest also favors the award of a preliminary injunction to prevent the perpetration of fraud against trusting friends and members of the expatriate Laotian community."); *Kyko*, 2013 WL 12173381, at *4 ("The Court also finds an order preserving the status quo and preventing Defendants from transferring or dissipating funds will advance the public interest. Defendants' alleged fraud involves falsely representing itself as numerous multi-billion dollar companies and in-turn deceiving Plaintiffs. Preserving the status quo until a more through vetting of Plaintiffs' claims can occur is, in this instance, in the interest of the public." (citing *Federal Sav. and Loan Corp. v. Ferm*, 1989 WL 88415, *5 (9th Cir. 1989) (finding evidence of fraud sufficient to show public interest in preventing further injury)); *ST Ventures, LLC v. KBA Assets & Acquisitions LLC*, 2012 WL 3647656, at *3 (E.D. Cal. Aug. 23,

PAGE 12 – *EX PARTE* TEMPORARY RESTRAINING ORDER

2012) ("Second, although the dispute in this case relates to a purely private transaction, the public interest is promoted, at least in a general way, when alleged fraud or conversion is thwarted.").

**C. Bond**

Federal Rule of Civil Procedure 65 instructs that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Federal courts, however, have discretion as to the amount of security and may even dispense with the security requirement altogether. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("'Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*.' In particular, "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.'" (emphasis and alteration in original) (citation omitted) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003))); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("'The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.'" (quoting *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985))).

Plaintiff requests a nominal bond in the amount of $1, arguing that such a nominal bond should be required because this case is about returning Plaintiff's assets that have been wrongfully taken from her and there is no realistic likelihood of harm to Defendants. Given the significant amount of Plaintiff's assets that she alleged was fraudulently taken from her by Defendants and the Court's finding that Plaintiff has a likelihood of success on the merits, and

PAGE 13 – *EX PARTE* TEMPORARY RESTRAINING ORDER

considering the relative hardships, the Court concludes that to require any security in this case would effectively deny Plaintiff access to judicial review and that there is no realistic likelihood of harm to Defendants from enjoining their conduct. Accordingly, no bond shall be required.

**D. Relief Granted**

It is **HEREBY ORDERED** that:

1. Until further Order of the Court, not to exceed 14 days from the date and time of this Order, the following Defendants, their assumed business names and affiliates, are hereby restrained from spending, transferring, encumbering, or otherwise disposing of funds or assets originating from Plaintiff or traceable to Plaintiff, including derived from the real properties located at 779 W. Chestnut St., Washougal, WA and 135 E. Telima Ln, Bend, OR, from any account owned or controlled by:

    a. Defendant ALIREZA ZAMANIZADEH, a/k/a ALI ZAMANI;

    b. Defendant ADULT CARE SEARCH, an Oregon non-profit, or its assumed business names Adult Care Association, US Seniors Association, and US Seniors Foundation; and,

    c. ACareOption.com, Inc., an Oregon for-profit corporation owned and controlled by Defendant Zamani.

2. Chase Bank accounts ending in numbers *6923 (Adult Care Search), *2074 and *3236 (both ACareOption.com, Inc.) are restricted and frozen from any access, preventing any withdrawals or transfers of funds until further notice of the Court;

3. Defendants may not sell, transfer, pledge, encumber, or otherwise dispose of the real properties located at 779 W. Chestnut St., Washougal, WA and 135 E. Telima Ln, Bend, OR.

4. Defendants may not take any action under any power of attorney related to Plaintiff.

5. Defendants may not access any funds, accounts, or assets owned or provided by Plaintiff.

6. Until further Order of the Court, any documents or information obtained during the course of this proceeding, whether through party discovery or subpoena, that relate to Plaintiff's assets shall not be disclosed to Defendants Zamani or ACS, but instead shall be treated by Defendants' counsel as "attorney eyes only."

7. The parties shall appear at a hearing before the undersigned U.S. District Judge on Friday, January 19, 2018, at 3:00 p.m., in Courtroom 15B, U.S. District Court, District of Oregon to show cause why a preliminary injunction should not issue and why the conduct restrained by this Order should not continue during the pendency of this action.

8. If Defendants Zamani or ACS request to unfreeze any of the listed accounts or others related to each Defendant or ACareOption.com, Inc., Defendants shall arrange to deposit with the Court $590,329.12, which equals the amount deposited in Defendant ACS's account originating from Plaintiff, pending full resolution of this action.

**IT IS SO ORDERED.**

DATED AND SIGNED this 10th day of January, 2018, at 8:45 a.m.

Michael H. Simon
United States District Judge