IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ANGELA TORRES,** <br><br> Plaintiff, <br><br> v. <br><br> **ALIREZA ZAMANIZADEH, a/k/a ALI ZAMANI,** an individual, and **ADULT CARE SEARCH,** a foreign non-profit corporation, <br><br> Defendants. | Case No. 3:17-cv-1270-AC <br><br> **OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION** |

**Michael H. Simon, District Judge.**

On January 10, 2018, the Court entered a temporary restraining order restraining Defendants from any and all activity resulting in the expenditure, encumbrance, or other disposition of funds or real property that may be traced back to Plaintiff. The Court ordered Defendants to appear and show cause why the Court should not issue a preliminary injunction. The Court held a hearing on January 19, 2018, and at the request of the parties extended the temporary restraining order and rescheduled the hearing for February 2, 2018. A few days before the hearing on February 2, 2018, counsel for Defendants withdrew. Defendant Alireza Zamanizadeh ("Zamani") appeared *pro se* at the February 2, 2018 hearing.

PAGE 1 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

After considering the record and the arguments and assertions made at the hearing, the Court grants Plaintiff's motion for a preliminary injunction.

**STANDARDS**

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

**BACKGROUND**

Plaintiff filed this case on February 21, 2017, in Clark County Superior Court in the State of Washington, alleging state court claims for fraud and unjust enrichment. Defendants removed the case to this Court on August 15, 2017. Plaintiff alleges that Zamani fraudulently induced Plaintiff to temporarily transfer money and one piece of real property to a charitable organization

PAGE 2 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

owned by Zamani—Defendant Adult Care Search ("ACS")—and to sign a power of attorney authorizing Zamani to engage in real estate transactions on Plaintiff's behalf. Plaintiff further alleges that Zamani then refused to return those monetary and real propery assets.

In support of her motion for a temporary restraining order and preliminary injunction, Plaintiff submitted her declaration, the declaration of a state investigator, and the declaration of her counsel. Plaintiff's declaration attests to the following facts: (1) Zamani used his personal relationship with Plaintiff to induce her to transfer to ACS money and assets and to sign a power of attorney granting Zamani authority over real estate transactions; (2) in June 2016 Plaintiff transferred $290,000 from her retirement account to ACS and transferred her Washington residence via quitclaim deed to ACS; (3) Plaintiff never intended to permanently donate those assets to ACS or to give them to Zamani; (4) Zamani convinced Plaintiff to transfer those assets to Zamani temporarily to shield them during Plaintiff's divorce proceedings and Zamani promised he would return them to Plaintiff; (5) Plaintiff nonetheless reported the assets during her divorce proceedings; (6) Zamani represented to Plaintiff that he has foreign bank accounts and assets and companies abroad; (7) Plaintiff repeatedly requested the return of her real property and money and Zamani would indicate his willingness to meet and do so and then not show up or otherwise stall; (8) Zamani finally stated that the money and real property was a "donation" to ACS and sent a donation receipt in February 2017, nearly eight months after the purported donation; (9) Plaintiff was awarded a piece of real property in Bend, Oregon as part of her divorce and in November 2016 Zamani asked her for the address of the property purportedly so he could ensure that there were no liens on the property; (10) on February 15, 2017, Zamani used the power of attorney he had obtained from Plaintiff to transfer the Bend, Oregon property to ACS and then obtained a $300,000 cash-out mortgage on the property; and (11) Plaintiff was

unaware of the transfer of the Bend, Oregon property and subsequent mortgage and did not learn about it until an investigation was conducted by the State of Oregon into ACS. Plaintiff attached numerous exhibits, including text messages and emails between her and Zamani, the power of attorney, the quit claim deeds, the money transfers, and the Trust Deed for the mortgage on the Bend property, supporting Plaintiff's factual assertions.

The declaration of Frank M. Najar, an investigator with the Oregon Department of Justice's Charitable Activities Section, states that: (1) he investigated ACS and concluded that ACS does not perform any charitable activities; (2) 86 percent of ACS's funds deposited between February 2014 and February 2017 came from Plaintiff; (3) the money taken from Plaintiff was used for Zamani's personal benefit and not for any charitable purpose; (4) he noted the $300,329.12 deposit into ACS's account and when asked for documentation relating to the deposit discovered the fact that it was from a cash-out mortgage on Plaintiff's Bend, Oregon property; (5) of the $590,329.12 taken from Plaintiff and deposited into ACS's bank account, Zamani withdrew at least approximately $142,000 in cash, without explanation for how that cash was spent; and (6) of the $590,329.12 taken from Plaintiff and deposited into ACS's bank account, Zamani transferred at least approximately $338,700 from the ACS bank account and into the bank account of Zamani's for-profit company, ACareOption.com, whereas Zamani transferred only approximately $56,000 back from ACareoption.com to ACS.

Finally, Plaintiff's counsel represented to the Court in his declaration that he filed the motion for temporary restraining order *ex parte* because he is concerned that if notice were given Zamani would likely attempt to move, withdraw, spend, encumber, or dispose of Plaintiff's remaining cash and real estate assets under Defendant Zamani's ownership or control, or under ownership or control of Defendant ACS or Defendant Zamani's ACareOption.com, Inc.

Plaintiff's counsel noted that Zamani has demonstrated his disregard for courts by encouraging Plaintiff to shelter her assets in her divorce, still has Plaintiff's power of attorney in his possession, and has demonstrated that he will dispose of Plaintiff's assets improperly by transferring title to Plaintiff's Bend property and taking a cash-out mortgage without Plaintiff's knowledge. Counsel further pointed out that Zamani has stated that ACS owns the assets and can do with them whatever it wants and has represented that he has bank accounts and assets in foreign countries, making it a viable risk that he can transfer Plaintiff's assets outside the country. Based on this evidence, the Court entered a temporary restraining order.

Although Defendants did not file any response to the Court's order to show cause or before the preliminary injunction hearing, at the hearing Zamani provided some factual background from his perspective. Zamani claims that Plaintiff is making false allegations against Defendants after Zamani rejected Plaintiff's desire for a continued personal relationship. Zamani asserts that Plaintiff donated funds to Zamani's charity without his knowledge and of Plaintiff's own volition. Zamani also states that when he traveled to Iran he encountered difficulties with the Iranian government as a result of Plaintiff's communications with Zamani, and that because of those problems he was required to pay hundreds of thousands of dollars to the Iranian government. Zamani contends that when he told Plaintiff this, she offered some of her assets to help Zamani make the payment. Zamani further states that his relevant bank accounts only have approximately $35,000.

## DISCUSSION

### A. *Winter* Factors

#### 1. Likelihood of Success on the Merits

The Court finds that Plaintiff has shown a likelihood of success on the merits of her fraud and unjust enrichment claims. Plaintiff transferred $290,000 of her retirement funds to ACS in

PAGE 5 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

two transactions, one on June 13, 2016 and one on June 22, 2016. Plaintiff executed a quitclaim deed transferring her Washington property to ACS on June 14, 2016.

Plaintiff claims that these transfers were intended to be temporary and that Zamani promised to return the money and property to Plaintiff. Plaintiff claims that she relied on Zamani's representations that the assets would be returned in transferring them and in signing the power of attorney. Zamani asserts that Plaintiff transferred the monies without his knowledge and that they were intended to be charitable donations at the time made. The text messages submitted by Plaintiff, however, support Plaintiff's assertions. When Plaintiff makes requests to Zamani regarding the return of her money and property, Zamani responds regarding setting meeting times or times to speak on the telephone, or chastising Plaintiff for putting such information in writing. Zamani does not respond that Plaintiff is incorrect in her assumption that the transfers were temporary and were, instead, actually permanent donations to ACS. The latter response would be expected if Zamani had not made representations that the assets would be returned and instead had believed the transfers to be charitable donations. Further, ACS did not send a charitable donation receipt to Plaintiff until February 2017, when Plaintiff became more forceful in her demands for the return of the assets and the relationship between the parties deteriorated. If Zamani and ACS believed Plaintiff's June 2016 transfers were considered charitable donations at the time made, it is expected that a donation receipt would have been issued at that time.

Moreover, the investigation by the State of Oregon supports Plaintiff's claims. The State concluded that ACS is not a genuine charity, that 86 percent of all its revenues from February 2014 through February 2017 was the approximately $590,000 that came from Plaintiff's assets, and that more than $425,000 of those funds was used by Zamani for his

PAGE 6 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

personal gain. This supports that Zamani did not genuinely believe that the transfers from Plaintiff were contributions to a charity, to be used for charitable purposes.

Plaintiff also testifies in her declaration that Zamani told her she had to sign a power of attorney in order to quitclaim Plaintiff's Washington property to ACS. This statement was false, and the Court finds that Plaintiff has shown a likelihood of success that Zamani knew it was false at the time it was made. This supports Plaintiff's fraud claim. In his text messages Zamani repeatedly represents his expertise in financial and real estate matters. It is a reasonable inference that he would know that Plaintiff could quitclaim the property without signing a power of attorney to Zamani, particularly because Zamani did not sign the quitclaim deed and thus the power of attorney was irrelevant to that transaction. The power of attorney was only relevant if Zamani intended to conduct other real estate transactions in Plaintiff's name, which he later did with respect to Plaintiff's Bend, Oregon property.[1]

2. **Irreparable Harm**

The Court finds a likelihood of irreparable harm if a preliminary injunction is not issued. The State of Oregon has concluded that Zamani has created a charitable organization that has not been used for charitable purposes but instead has been used for Zamani's personal gain, and that Zamani used this charitable organization to take Plaintiff's money and use it for Zamani's personal purposes. Approximately $30,000 remains in the purported charity's account. If the money is not frozen, it will likely be dissipated. Moreover, Zamani testified that only approximately $35,000 of Plaintiff's approximately $590,000 remains in the combined bank

---

[1] At this time, Plaintiff has not amended her complaint to add any allegations relating to the Bend, Oregon property and so the Court does not consider the likelihood of success on any claim related to Defendants' alleged conduct relating to this property.

PAGE 7 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

accounts of Zamani's business and purported charity. Thus, if the Court does not freeze these funds it is very likely the final $35,000 will be dissipated before this litigation is finalized.

The Court also finds a likelihood of irreparable harm relating to Plaintiff's real property. Zamani has already used Plaintiff's power of attorney to transfer one parcel of real property out of Plaintiff's name and into the name of Zamani's charity, and then taken an approximately $300,000 cash-out mortgage on that property. Zamani still has Plaintiff's power of attorney for real estate transactions in Zamani's possession.

There is also evidence that in addition to running a fraudulent charity, Zamani has strategized how to shelter assets from court proceedings, has international bank accounts and assets, has dual citizenship in the United States and Iran, and has dissipated more than $425,000 of Plaintiff's assets to date. Although Plaintiff did not move for an injunction immediately upon filing her lawsuit, and delay is a factor in considering irreparable harm, at that time Plaintiff was unaware that Zamani had transferred Plaintiff's Bend, Oregon property to ACS and took the cash-out mortgage. It is not clear when Plaintiff became aware of this fact, but it was discovered by the Oregon investigator sometime after he interviewed Zamani on July 27, 2017. Thus, the Court does not find that Plaintiff engaged in an unreasonable delay precluding a finding of irreparable harm.

### 3. Balancing the Equities

In weighing equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). Granting the injunction would freeze Plaintiff's remaining assets in the possession of Defendants. The injunction also freezes the bank account of ACS, which consists primarily of Plaintiff's assets, and two accounts of ACareOption.com, Inc.,

in which the state of Oregon investigation found a significant amount of Plaintiff's funds were transferred.

The potential harm to Plaintiff in not issuing an injunction has been discussed above. Granting the injunction may harm Defendants because they would not have access to Plaintiff's remaining assets in their possession or control. The Court finds that this potential for harm is negligible, however, because Plaintiff has a likelihood of success in proving that her assets were never intended to go to Defendants on a permanent basis. Further, if she fails to so prove, then Defendants will have access to her assets when this case ends.

The injunction may harm ACS because its bank account will be frozen. This is harmful, but the harm is tempered by the State of Oregon's findings that ACS is a fraudulent charity, does not perform any charitable activities, and its funds have only been used for Zamani's personal use. Moreover, because only approximately $30,000 remains in ACS's account, compared to the more than $590,000 taken from Plaintiff, the harm is imbalanced.

The injunction may also harm ACareOption.com, because one of its accounts would be frozen.[2] A significant amount of Plaintiff's funds, however, were transferred into ACareOption.com bank accounts. Moreover, Zamani testified that there is only $5,000 in the account of ACareoption.com. Thus, the potential harm to ACareOption.com does not outweigh the potential harm to Plaintiff.

In considering the specific dollar amounts at issue and for the same reasons discussed in the court's opinion granting the temporary restraining order, the Court finds that the potential harm to Defendants and ACareOption.com, on balance, is outweighed by the likely harm to Plaintiff if an injunction is not issued. As discussed above, Zamani used Plaintiff's power of

---

[2] Zamani testified that the second account has been closed.

PAGE 9 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

attorney after the parties' relationship deteriorated, without Plaintiff's knowledge, to transfer ownership of Plaintiff's Bend property and take a cash-out mortgage. Plaintiff is possibly facing losing her real property. Zamani has also used his for-profit corporation ACareOption.com to take money from his purported charity and has taken significant cash out of his purported charity. Given Zamani's dissipation of Plaintiff's assets, strategization to avoid court proceedings, and representations of his international bank accounts, assets, connections, and citizenship, the potential harm facing Plaintiff is significant. *Cf. Kyko Glob., Inc. v. Prithvi Info. Sols., Ltd.*, 2013 WL 12173381, at *4 (W.D. Wash. June 19, 2013) ("A balancing of the hardships weighs in favor of [Plaintiff]. . . . Prohibiting Defendants from transferring or dissipating funds without Court approval—at least until they can be heard on the matter in the next ten days—is not a burdensome condition given that Defendants were not wholly engaged in a legitimate, lawful business. Thus, the risk weighs more heavily in favor of Plaintiffs.").

Moreover, if Defendants or ACareOption.com want access to the frozen assets they will have the opportunity to post an appropriate bond. The injunction essentially preserves the status quo and provides the opportunity for Plaintiff to have her assets returned if she prevails. The Court has found that Plaintiff has a likelihood of success in proving that her assets were never intended to be a donation to ACS, and certainly not intended to be given to ACareOption.com, and thus freezing these accounts preserves Plaintiff's funds so that they cannot be further dissipated.

### 4. Public Interest

When determining the public interest, a court "primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). Granting the injunction would not harm the public interest. There is, however, public interest in preventing ongoing fraudulent behavior and

PAGE 10 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

dissipation of fraudulently-obtained funds. *See Panyanouvong v. Aphay*, 2014 WL 2986507, at *6 (W.D. Wash. July 1, 2014) ("The public interest also favors the award of a preliminary injunction to prevent the perpetration of fraud against trusting friends and members of the expatriate Laotian community."); *Kyko*, 2013 WL 12173381, at *4 ("The Court also finds an order preserving the status quo and preventing Defendants from transferring or dissipating funds will advance the public interest. Defendants' alleged fraud involves falsely representing itself as numerous multi-billion dollar companies and in-turn deceiving Plaintiffs. Preserving the status quo until a more through vetting of Plaintiffs' claims can occur is, in this instance, in the interest of the public." (citing *Federal Sav. and Loan Corp. v. Ferm*, 1989 WL 88415, *5 (9th Cir. 1989) (finding evidence of fraud sufficient to show public interest in preventing further injury)); *ST Ventures, LLC v. KBA Assets & Acquisitions LLC*, 2012 WL 3647656, at *3 (E.D. Cal. Aug. 23, 2012) ("Second, although the dispute in this case relates to a purely private transaction, the public interest is promoted, at least in a general way, when alleged fraud or conversion is thwarted.").

**B. Bond**

Federal Rule of Civil Procedure 65 instructs that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Federal courts, however, have discretion as to the amount of security and may even dispense with the security requirement altogether. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("'Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*.' In particular, "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.'" (emphasis and alteration

PAGE 11 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

in original) (citation omitted) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003))); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("'The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.'" (quoting *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985))).

Plaintiff requests a nominal bond in the amount of $1, arguing that such a nominal bond should be required because this case is about returning Plaintiff's assets that have been wrongfully taken from her and there is no realistic likelihood of harm to Defendants. Given the significant amount of Plaintiff's assets that she alleged was fraudulently taken from her by Defendants and the Court's finding that Plaintiff has a likelihood of success on the merits, and considering the relative hardships, the Court concludes that to require any security in this case would effectively deny Plaintiff access to judicial review and that there is no realistic likelihood of harm to Defendants from enjoining their conduct. Accordingly, no bond shall be required.

## C. Relief Granted

It is **HEREBY ORDERED** that:

1. Until further Order of the Court, the following Defendants, their assumed business names and affiliates, are hereby restrained from spending, transferring, encumbering, or otherwise disposing of funds or assets originating from Plaintiff or traceable to Plaintiff, including derived from the real properties located at 779 W. Chestnut St., Washougal, WA and 135 E. Telima Ln, Bend, OR, from any account owned or controlled by:

    a. Defendant ALIREZA ZAMANIZADEH, a/k/a ALI ZAMANI;

    b. Defendant ADULT CARE SEARCH, an Oregon non-profit, or its assumed business names Adult Care Association, US Seniors Association, and US Seniors Foundation; and,

    c. ACareOption.com, Inc., an Oregon for-profit corporation owned and controlled by Defendant Zamani.

2. Chase Bank accounts ending in numbers *6923 (Adult Care Search), *2074 and *3236 (both ACareOption.com, Inc.) are restricted and frozen from any access, preventing any withdrawals or transfers of funds until further notice of the Court;

3. Defendants may not sell, transfer, pledge, encumber, or otherwise dispose of the real properties located at 779 W. Chestnut St., Washougal, WA and 135 E. Telima Ln, Bend, OR.

4. Defendants may not take any action under any power of attorney related to Plaintiff.

5. Defendants may not access any funds, accounts, or assets owned or provided by Plaintiff.

6. Until further Order of the Court, any documents or information obtained during the course of this proceeding, whether through party discovery or subpoena, that relate to Plaintiff's assets shall not be disclosed to Defendants Zamani or ACS, but instead shall be treated by Defendants' counsel as "attorney eyes only."

7. The retainer held by attorney Timothy J. Calderbank, Landerholm, P.S., 805 Broadway Street, Suite 1000, Vancouver, WA 98666, up to $5,000, may be refunded to Defendants and is not subject to this preliminary injunction.

8. Defendants may move to have this preliminary injunction modified, reconsidered, or dissolved at any time.

9. If Defendants Zamani or ACS request to unfreeze any of the listed accounts or others related to each Defendant or ACareOption.com, Inc., Defendants shall arrange to deposit with the Court $590,329.12, which equals the amount deposited in Defendant ACS's account originating from Plaintiff, pending full resolution of this action.

**IT IS SO ORDERED.**

DATED AND SIGNED this 6th day of February, 2018.

Michael H. Simon
United States District Judge