1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF OREGON

3

4   ANGELA TORRES,                    )

5                      Plaintiff,     )   No. 3:17-cv-1270-AC
                                      )
6              vs.                    )   February 2, 2018
                                      )
7   ALIREZA ZAMANIZADEH, a/k/a ALI    )   Portland, Oregon
    ZAMANI, an individual, and        )
8   ADULT CARE SEARCH, a foreign      )
    non-profit corporation,           )
9                                     )
                       Defendants.    )
10

11

12

13              TRANSCRIPT OF PROCEEDINGS

14           (Preliminary Injunction Hearing)

15

16      BEFORE THE HONORABLE MICHAEL H. SIMON

17        UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22

23  Court Reporter:          Ryan White, RMR, CRR, CSR/CCR
                             United States District Courthouse
24                           1000 SW 3rd Avenue, Room 301
                             Portland, Oregon 97204
25                           (503) 326-8184

1                         APPEARANCES

2

3   For the Plaintiff:        PDX LAW GROUP
                              By:  DAVID RICHARDSON
4                             david@pdxlawgroup.com
                              621 SW Morrison Street, Suite 1200
5                             Portland, Oregon 97205
                              (503) 546-0141
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (February 2, 2018; 3:02 p.m.)

 2

 3                    P R O C E E D I N G S

 4

 5          THE COURT:  Good afternoon.

 6          Please be seated.  Relax.

 7          THE CLERK:  Your Honor, this is the time set for a

 8  preliminary injunction hearing in civil case 17-1270-AC, Torres

 9  versus Zamanizadeh, et al.

10          And can I have counsel and defendant in court please

11  identify yourself for the record beginning with plaintiff.

12          MR. RICHARDSON:  David Richardson on behalf of

13  plaintiff, Your Honor.

14          THE COURT:  Good afternoon, Mr. Richardson.

15          MR. ZAMANIZADEH:  Ali Zamani, Your Honor.

16          THE COURT:  And good afternoon, Mr. -- is it --

17          MR. ZAMANIZADEH:  Zamani is fine, Your Honor.

18          THE COURT:  Zamani?

19          MR. ZAMANIZADEH:  Yes.  Zamani is fine.

20          THE COURT:  Thank you, sir.

21          MR. ZAMANIZADEH:  Either/or.  Whichever is more easier

22  for you.

23          THE COURT:  Thank you, sir.  And welcome.  Good

24  afternoon.

25          I do understand that you did have -- the defendant did
```

1    have an attorney, that the attorney -- you are welcome to be

2    seated, relax -- that the attorney filed a motion to withdraw

3    and that Judge Acosta granted that motion.

4            I understand that that was fairly recent, so you may

5    not have had very much time yet to locate a new attorney to

6    represent you.  And so I will -- whatever we do today, I will be

7    certainly glad to reconsider if you have a new attorney coming

8    to assist you.

9            But right now we are here because a few weeks ago, I

10   believe it was on January 10th, I entered a temporary

11   restraining order, and part of that order also included an order

12   to show cause why I shouldn't issue a preliminary injunction.

13           I note that nothing formal has been -- nothing has

14   been filed in opposition to a preliminary injunction.  My guess

15   is that's largely because of the transition from your attorney

16   to now you being unrepresented.

17           And so if both sides want to tell me at all about

18   where things stand in the current dispute, I'll be glad to

19   listen to you, and then I've got some suggestions about how we

20   proceed from here.

21           Mr. Richardson, since you represent the plaintiff, why

22   don't you begin by telling me from your perspective or your

23   client's perspective where things stand now, and then I'll hear

24   from the defendant.

25           Keep in mind, both of you, it is not my role to assist

1    in a settlement here, so do not disclose to me any offers or

2    counteroffers on settlement.  I mainly want to know where are we

3    in the litigation and in the request for preliminary injunction.

4              Mr. Richardson?

5              MR. RICHARDSON:  Would you prefer me to stand,

6    Your Honor, or remain seated?

7              THE COURT:  Your preference.

8              MR. RICHARDSON:  I'll remain seated.  Thank you.

9              THE COURT:  I'm going to remain seated.  So you do

10   what you want.

11             MR. RICHARDSON:  Okay.  Your Honor, there's been no

12   progress since two weeks ago, and I honestly feel that it was a

13   bait and switch tactic, and I felt like there were

14   representations that were made that were not accurate.

15             I do have a supplemental declaration with exhibits,

16   but I worry that there's going to be settlement in there.  But

17   we could go potentially back in chambers.  But I do have a

18   declaration prepared.

19             I'm not sure if it's relevant.  I'm not sure that

20   whether or not a settlement on good faith on either side was

21   entered into matters regarding the standards of whether a

22   preliminary injunction should be entered.

23             I mention it, though, just, for one, I think that

24   Mr. Zamani will probably bring it up as well, but more

25   importantly, I feel that there has been opportunity for a

1  response to be filed.  It's true that Mr. Calderbank filed his

2  motion to withdraw, but that was after our hearing in front of

3  Your Honor, and they had two weeks prior to that to file a

4  response.

5          And I feel -- my concern is it would be prejudice to

6  my client that if we push this out a month or longer,

7  that -- and new counsel is retained, that now they get a second

8  bite at the apple, they have another opportunity to file a

9  response.

10          So even -- I guess I would be okay extending the

11  temporary restraining order if that's something you are going to

12  recommend to us.  But I would ask that the record be frozen

13  where it is, and I think that would be fair.

14          THE COURT:  Well, I will say this, that the suggestion

15  I'm going to put to both of you, and I'll hear both views, and

16  I'll turn to Mr. Zamanizadeh in a few moments, is that I don't

17  think I can extend a temporary restraining order since under the

18  rules it can only last for 28 days absent agreement of the

19  parties.  But what I can do is enter a preliminary injunction.

20  I do think that there's enough information in the record to

21  support a preliminary injunction.

22          But that said, I would want to give the defendant an

23  opportunity to have relief from that if and when he gets an

24  attorney or wants to, on his own, file a motion to have it

25  dissolved.

1          So my tentative thinking, but I'd like to hear from

2    both of you, is to enter a preliminary injunction on the same

3    terms as the temporary restraining order, however, it would then

4    be without prejudice to the defendant and he would have leave to

5    move to lift the preliminary injunction order either if he gets

6    an attorney and wants to file that motion, or if he decides to

7    represent himself and chooses to file a motion to lift or amend

8    or dissolve the preliminary injunction.  I will let him do that

9    and I'll listen to it on the merits.

10          At the same time, I will also listen to you,

11   Mr. Richardson, as to whether there's any undue or unfair

12   prejudice to your client.

13          Now is not the time for me to decide to freeze the

14   record or anything like that.  But if there's some argument and

15   some evidence that comes in later to try to dissolve the

16   preliminary injunction, you can let me know if there's any undue

17   or unfair prejudice to your client and I'll consider that.

18          But I think that there's not likely to be prejudice if

19   today I enter a preliminary injunction because, even if it was

20   opposed right now, I would enter a preliminary injunction -- if

21   I entered a preliminary injunction and then something happened

22   in the future where the defendant, either himself or through an

23   attorney, asks me to dissolve it or to modify it, I'd listen,

24   and then we would deal with that on the merits.

25          So I'll ask you first, Mr. Richardson, on behalf of

1    plaintiff, any objection to that approach?

2    MR. RICHARDSON:  No objection, Your Honor.  That

3    sounds like a reasonable compromise.

4    THE COURT:  Okay.  Mr. Zaman- --

5    MR. ZAMANIZADEH:  Your Honor, just Zamani is fine.

6    Zamani is fine.

7    THE COURT:  Zamani.  Mr. Zamani.  Excuse me.

8    So first of all, if you have any preliminary comments

9    in response to what Mr. Richardson had to say, you're certainly

10    welcome to say them and I'll listen to you.

11    But also I'd like to hear your view on my proposal

12    that I enter a preliminary injunction right now on the same

13    terms as my previous temporary restraining order, and that will

14    be without prejudice, you will have full leave either if you,

15    representing yourself, want to file a motion to have me amend it

16    or dissolve it or modify it in any way, or if you get an

17    attorney and your attorney wants me to modify it or amend it or

18    even dissolve it, and I will certainly listen to you, I will

19    listen to both sides, and make appropriate rulings at that time.

20    So Mr. Zamani?

21    MR. ZAMANIZADEH:  Your Honor, may I stand or --

22    THE COURT:  Whatever you wish.

23    MR. ZAMANIZADEH:  Your Honor, I appreciate the

24    Court -- time of the Court.  And if I may explain and give a

25    little bit of short background on this before the preliminary

1    injunction is issued, I would very much appreciate that.

2            Your Honor, the whole case of the complaint and the

3    TRO is based on a rejected lover to the point that the plaintiff

4    was forcefully and intended to have a relationship with me and I

5    rejected it.  She had done all the donation or issues of the

6    complaint on her own, mailed to the company without my

7    knowledge.  She had continued the relationship while I was

8    even -- travel several times to my country for transferring my

9    assets from there to here.

10            As being a US citizen and dual citizenship with Iran,

11    the Iranian government last year, actually in 2016, issued an

12    order that Iranians that hold two citizenships, specifically for

13    United States, that they have two options; one, they have to

14    relinquish one of the citizenships; the other, they have

15    approximately about 24 months to transfer all their assets or

16    the government will take over.

17            Because of this matter was based on the relationship,

18    as I said, with the plaintiff, she offered power of attorneys to

19    me, offered her assets in order to obtain a loan based on when I

20    was traveling to Iran, when I was in Iran, she was going to have

21    divorce.  She had contacted me, stated that she wanted to make a

22    donation to my company and hide her assets for her divorce.  I

23    had rejected it because it was against the law and against the

24    Court's rule.

25            However, I did indicate that if she does make a

1    donation, she then is able to obtain the tax-deductible credit

2    that we can offer.

3            She had gone -- without my knowledge, without my

4    presence, she had made the donation, mailed to my office,

5    Your Honor, power of attorney, and then she -- when she was in

6    Salina, California, she made additional donation to our company

7    and there was no problem, there was no issue, there was no

8    demand, Your Honor.  I never received a demand letter from the

9    attorney or the plaintiff for returning her assets.  However, I

10   offered if she returned the receipts to us, we can go ahead and

11   proceed with what -- we can settle with each other.

12           Upon my -- when I was in Iran, Your Honor, I

13   asked -- I asked my family, even -- the Iranian government are

14   very, very dangerous.  I'm sure you have heard in the news that

15   people go from United States and get arrested there because of

16   different reasons.

17           I had -- we have substantial properties, family

18   properties, that my -- my own property in Iran that I have sold

19   and ready to transfer.  However, when I was in Iran, when I

20   leave Iran, I asked the family and especially the plaintiff, do

21   not e-mail me, do not ask me -- do not contact me for personal

22   matter.  You're 10,000 miles away.  However -- what I'm doing in

23   Iran or how am I feeling or how the government is treating me

24   has no merit, do not talk to me, because they were constantly

25   watching us, basically following us and listening to the phones

1   and so forth.  She continued sending all her requests for me

2   assisting her suggesting what she should do in her divorce while

3   she had an attorney.

4          This caused the problem for me in Iran.  The problem

5   was that the government of Iran considered me as a spy of United

6   States.

7          And I want to -- there is some information that I'm

8   going to give to this Court, Your Honor.  I would like to have

9   those things sealed.  These are --

10          THE COURT:  I'd rather not have any sealed information

11   right now.

12          MR. ZAMANIZADEH:  Okay.

13          THE COURT:  So don't tell me anything that would need

14   to be sealed.

15          MR. ZAMANIZADEH:  All right.  And so as a result of

16   that, I was incarcerated.  However, the Iranian government has

17   this game that they play.  They know how much asset you have,

18   you are US citizen, you come over, and they either try to

19   incarcerate you or try to find a reason to seize your asset and

20   then they sell back to you this -- okay, pay us this amount and

21   you can get your asset or you can leave the country.

22          However, I did -- they had frozen my assets and they

23   had my passport.  I had to put all the assets -- and they

24   requested approximately $680,000 bond for me to leave.  I didn't

25   have the money.  And so they kept the property as a collateral,

1  gave me the passport, enough for me to leave the country, to get

2  prepared and provide them with the money.

3      I came back over here, explained that to the

4  plaintiff, that your communication obviously has caused me a lot

5  of problem; however, it's not your responsibility, it's my

6  responsibility.  But I do need to come up with the money in

7  order to go back to that country.

8      Within the time of the donation, original donation,

9  Your Honor, which was in approximately beginning of the

10  June 2016, through February, I had travelled approximately twice

11  to Iran.  Had I had any intention to harm the plaintiff, I

12  didn't have to come back.

13      And when I came back over here, Your Honor -- and

14  plaintiff herself, she did not even inform her own attorney that

15  after my arrival on December 21st of 2016, she issued a second

16  power of attorney to me because her divorce was final and that

17  she had received properties that are free and clear, she's

18  waiting for $700,000 to be transferred to her retirement account

19  and the money has not been transferred, and she offered me to

20  use one of the properties to obtain loan in order to be able to

21  take care of my problem, and then when my assets are unfrozen

22  and transferred over here, to get paid back.

23      When I rejected her in the relationship, Your Honor,

24  without any knowledge to me -- I told her that I was leaving on

25  or about February to Iran to take care of the matter.  She asked

1    me to delay my departure.  When I delayed my departure, I

2    immediately got served by a complaint.  No demand letter was

3    issued by an attorney.

4          And I came back.  I have been waiting, going through

5    this process.  Meanwhile, immediately right after the complaint,

6    plaintiff and her attorney, Mr. Richardson, contacted the

7    Department of Justice stating that we have defrauded her for

8    what receipts -- that our non-profit organization was not true

9    and created complaint in the Department of Justice which caused

10   a letter from the Department of Justice, inquiry to provide a

11   specific amount of documentation that I have all that here.

12         In July 2017, Your Honor, with the meeting that I had

13   with my attorney from Tonkon Torp, we provided every

14   documentation to the Department of Justice.

15         Up to this day, Your Honor, no citation has been

16   issued, no injunction has been issued, no violation has been

17   issued.  Basically nothing.

18         I then -- when I obtained a loan on the property based

19   on the power of attorney that the plaintiff had provided me, it

20   was a six-month interest only -- I paid all the payments.

21   Despite of the fact of the TRO filing by the plaintiff that it

22   states that no payment was paid and so forth, I have copies of

23   the checks, Your Honor, here.

24         I informed my attorney to send a settlement offer and

25   also informed the plaintiff that I am willing to pay back

1   everything, transfer all the assets that she had donated to the

2   company and provided me as a loan to her upon my return and

3   bringing in the assets.

4           She also provided me, Your Honor, on 2016 the

5   information about her own personal bank account, and she offered

6   me, said this is my personal bank account at Wells Fargo, this

7   is my password, user name, and information, and if you need any

8   money, go ahead and take it.  I never touched anything.

9           All right.  Then, we provided a settlement offer,

10  immediately on January 8th.  I was contacted by my attorney to

11  meet -- to discuss the settlement and so forth.  He stated to me

12  that Mr. Richardson and the plaintiff have contacted the FBI

13  against me for possibility of flight.

14          Your Honor, I've been in this country since 1976, for

15  over 40 years.  All my family which I have -- there is no other

16  family back home.  My father, my mother, my sister, and my

17  brother, they are all US citizens here.  I have elderly parents

18  that are in their 90s with Alzheimer's and dementia.  We take

19  care of them.  Me and my sister take care of them.

20          So providing the fictitious lies in order to obtain

21  TRO is only for malicious behavior to tie my hands up.

22          The balance of the account that plaintiff and her

23  attorney are demanding in the complaint in excess

24  of -- including the property is in excess of, say, 560- or

25  $590,000 of which some of it are real estate.  Nobody has

1  touched anything, nobody has sold anything, nobody has done

2  anything.  And having that to be said, connects back, getting a

3  restraining order to tie my personal hand not to be able to pay

4  my attorneys, not to be able to pay representation.

5         And right after the last hearing that we had in front

6  of Your Honor, we asked the TRO hearing to be postponed to today

7  for possible settlement.  The settlement agreement and the

8  settlement time was set the minute we left the court.  We agreed

9  that on next Wednesday we meet at Mr. Richardson's office in

10  order to discuss that.

11         However, when on Tuesday I was asking for my attorney

12  what time do we have to be there, he stated that Mr. Richardson

13  has sent this totally unprofessional vulgar language about me

14  that they don't want to meet and so forth and so forth and so

15  forth.

16         Your Honor, I believe in the court we have two sides.

17  We both have to have the ability to represent or get represented

18  to provide the facts and let the judge to decide not by showing

19  up in the court, not informing my attorney that he is intending

20  to show up in the court and get a temporary restraining order

21  and then create -- providing also some fictitious lies to obtain

22  this temporary restraining order.

23         The total asset, Your Honor, that it is in the

24  company's account, it's approximately about $40,000.

25         THE COURT:  Is that for all three accounts?  Because

1    the accounts that I'm aware of, there's -- and I'll just use the

2    last four numbers -- there's the 6923 account of the Adult Care

3    Search, an Oregon nonprofit.

4            MR. ZAMANIZADEH:  Correct.

5            THE COURT:  There's the 2074 account, and then 3236

6    account, and those are both for acareoption.com.

7            Now, $40,000 for all three accounts?

8            MR. ZAMANIZADEH:  Your Honor, the 2074, I believe

9    that's it, that has been closed.  Because when I was in Iran, I

10   just tried to -- in 2016 to check the balance for the payment,

11   and when I came back, the Bank of Chase closed it due to the

12   violation of the --

13           THE COURT:  Okay.  Was there any money in it when it

14   was closed?

15           MR. ZAMANIZADEH:  No, there was no money in it.

16           And then the 69, I believe --

17           THE COURT:  6923.

18           MR. ZAMANIZADEH:  6923 is the Adult Care Search which

19   is a nonprofit organization.  I have the bank statement, Your

20   Honor.

21           THE COURT:  Just tell me --

22           MR. ZAMANIZADEH:  $29,000, and in the Care Option is

23   approximately $5,000.

24           THE COURT:  Okay.

25           MR. ZAMANIZADEH:  And so I had left those things for

the company's operation while I'm gone to do my business and come back and take care of the matter.

However, Mr. Richardson denied the meeting for the restraining order, demanding, okay, pay us all the $590,000, do this, do this, in order for me to sit down -- you're a crook and you're a con artist.

And so right at the -- on Wednesday, that was where we were supposed to meet, and the meeting did not take place, my attorney calls me and says I'm going to withdraw. And we went in front of Judge Acosta. Judge Acosta allowed the withdrawal and sealed his declaration.

THE COURT: And I've not seen it.

MR. ZAMANIZADEH: Yes.

And I simply ask the judge -- Your Honor, this TRO is totally causing harm to me not to be able to provide or obtain attorney. Every attorney that I've met, Your Honor, in Portland, approximately about ten different law firms --

THE COURT: Although if there's only about, what, $35,000 in there, how is that interfering with your ability to obtain an attorney?

MR. ZAMANIZADEH: Your Honor, I have no -- I have no funds.

THE COURT: Okay. Those are the only -- how are you living?

MR. ZAMANIZADEH: Well, I am basically using my own

1    company --

2        THE COURT:  I don't understand.  So if all you

3    have -- see, all we're talking about, as far as I understand it,

4    in the Chase bank accounts, we're talking about three things.

5    The Chase bank accounts that you tell me have approximately

6    $35,000 -- Mr. Richardson, do you agree with that or do you have

7    any information one way or the other?

8        MR. RICHARDSON:  Just that he showed me the bank

9    accounts outside weeks ago and said the rest of the money has

10   been transferred to Iran which was -- the first thing -- sorry.

11   I shouldn't go further.

12       THE COURT:  I'm just -- I can't freeze that.

13       MR. RICHARDSON:  Right.  But that's what made me think

14   that maybe we need to settle because I don't -- there's no money

15   left.

16       THE COURT:  Okay.  Well, from the Chase bank accounts,

17   right now I'm accepting Mr. Zamanizadeh's word that -- and it is

18   documented --

19       MR. ZAMANIZADEH:  Yes.

20       THE COURT:  -- that there's about $35,000 in there.

21       Then we also -- as part of my temporary restraining

22   order, I've said he may not sell, transfer, pledge, encumber, or

23   otherwise dispose of two pieces of real property, one on

24   Chestnut Street in Washougal, Washington, and one on Telima Lane

25   in Bend, Oregon.

1            Now, those, as I understand it, were Ms. Torres'

2    properties; right?

3            MR. ZAMANIZADEH:  Correct.

4            THE COURT:  So you can't and probably shouldn't do

5    anything with those properties anyway.

6            MR. ZAMANIZADEH:  Don't intend to at all.

7            THE COURT:  So --

8            MR. ZAMANIZADEH:  I want -- yeah.

9            THE COURT:  So it sounds like what the dispute is

10   about is what should happen with those two pieces of real

11   property and what should happen to Chase bank for right now.

12   There may be a bigger dispute for trial.

13           But if you're telling me that my freezing of $35,000

14   in bank account assets is interfering with you obtaining a

15   lawyer because that's all the money you have, that leads me to

16   ask, then, how are you living?

17           MR. ZAMANIZADEH:  Your Honor, I have initially

18   established a company, Adult Care, in 2007 for the purpose of a

19   similar triad that the State of Oregon has a problem in

20   investigators for long-term care facilities and a lot of problem

21   within the long-term care facilities.  This was launched in 2007

22   and it was all over the news and immediately we went all

23   national.

24           And what has happened is, based on the attorney

25   general information that I have provided Your Honor, I

1    personally have funded the company throughout today.  And when

2    the company has funding, yes, I -- based on preliminary

3    agreement, based on loan agreement, based on every documentation

4    that we have provided to the attorney general, yes, I did

5    withdraw some funds in order to make the living, my loans that

6    I've paid which I -- at zero interest.

7              And I'm just waiting to go back to transfer all my

8    assets.  I don't want to go to that country.  I have no interest

9    in that country except that every time I go in there, I'm

10   thinking about I'm going to get either incarcerated or shot or

11   be called a spy.

12             THE COURT:  I understand.

13             MR. ZAMANIZADEH:  And so this, I have no interest in

14   the properties, Your Honor.

15             THE COURT:  Okay.

16             MR. ZAMANIZADEH:  I am willing to transfer and

17   provided that in the settlement offer to Mr. Richardson and the

18   plaintiff that I'm -- I have no problem of immediately

19   relinquish and transfer those back to the plaintiff.

20             And the funds, I have no problem repaying those

21   things.  It takes time for me to transfer funds.

22             Without being able to do my job in order to show my

23   good cause, I cannot be called --

24             THE COURT:  I understand.

25             Let me ask Mr. Richardson the following question, and

1    I'm not really talking settlement so much as I'm trying to

2    understand the preliminary injunction issue, whether I should

3    issue that and on what terms.

4         Would it be acceptable to the plaintiff, just for

5    preliminary injunction purposes, the case would then have to be

6    set for trial?  Because, as Mr. Zamani says, there's two sides

7    to every story, now is not the time for the finder of fact,

8    which may be a jury, to decide the actual causes of action that

9    are alleged in this case.

10        But in terms of the preliminary injunction issue,

11   would the plaintiffs be satisfied of me dissolving the

12   preliminary injunction as soon as Mr. Zamani transfers back to

13   the plaintiff title to the real property?

14        MR. RICHARDSON:  Absolutely not, Your Honor, and I'll

15   explain why.

16        For one, I think that the scope of the TRO goes

17   further.  It's not just -- I mean you specifically name those

18   accounts need to be frozen.

19        THE COURT:  Those are the ones that you asked for in

20   the TRO?

21        MR. RICHARDSON:  Correct.  But we also asked for other

22   things in the TRO as well, and those things are actually in the

23   order, specifically that each defendant is restrained from

24   spending, transferring, encumbering, or otherwise disposing of

25   funds originating or transfer- --

```
 1              THE COURT:  Hold on.  When you read that quickly --
 2              MR. RICHARDSON:  I'm sorry, Your Honor.
 3              THE COURT:  -- we're not going to have a clean record.
 4   So start again and tell me which paragraph in the order you're
 5   referring to.
 6              MR. RICHARDSON:  I apologize, Your Honor.  I just --
 7              THE COURT:  It's okay.
 8              MR. RICHARDSON:  I was listening for a while and
 9   getting my --
10              THE COURT:  Okay.
11              MR. RICHARDSON:  -- dander up.
12              So I apologize.  It's on page --
13              THE COURT:  Dander down.
14              MR. RICHARDSON:  Yeah.  Page 14 of your order.
15              THE COURT:  Right.  Which paragraph?
16              MR. RICHARDSON:  Paragraph 1.
17              THE COURT:  Okay.
18              MR. RICHARDSON:  And basically I think paragraph 1
19   indicates that all of the defendants are restrained from
20   spending, transferring, encumbering, or otherwise disposing of
21   funds or assets originating from plaintiff or traceable to
22   plaintiff.
23              And it goes on to include the real properties, but
24   obviously that's a lot broader than just freezing the three
25   Chase accounts.
```

1          And the reason I think this is important is the oral

2     testimony that was just given.  The declaration of the

3     Department of Justice employee Frank Nohar indicates that

4     Mr. Zamani received in total 591,000 from my client.  He just

5     testified there's only 35,000 left.  Where did it go?  Well, we

6     don't know yet.

7          And it may be that he elects to continue doing and

8     spending that money despite the fact that a permanent injunction

9     is in place.  But at least then we would have further cause of

10    action later for him violating the injunction.

11         We don't know at this point where the remaining

12    $565,000 is.  He has made oral representations to me first

13    before the hearing that he transferred 300,000 to Iran.  After

14    the hearing when I called him out on it, he said, no, it's

15    actually 500.  I don't know where it is.

16         But I think that we need the broad language in this

17    permanent injunction to protect us.  Because it goes further

18    that -- I think paragraph 5, he may not access any funds,

19    accounts or assets.  That power of attorney is still floating

20    around out there.  And so I think that we would much prefer to

21    keep it in place.

22         You agreed on your original temporary restraining

23    order that we had met our burdens and that the -- that we are

24    likely to succeed on the merits.  The burden then shifted to the

25    defendant to show why you should not enter a preliminary

1    injunction.  I don't believe the oral testimony today, when

2    weighed against the declaration given by the Department of

3    Justice, is sufficient to achieve that burden.

4         I would specifically address you to the declaration of

5    Frank Nohar.  And there's a lot of good stuff in here, but in

6    particular, paragraph 22, which is on page 5, he says that, "In

7    addition, the bank -- the documents," by that he means the bank

8    records, "show hundreds of transactions from these three

9    accounts during the review period that appear to be for personal

10   expenses.  These transactions included payment for domestic and

11   international airlines, restaurants, hotels, bars, nightclubs,

12   adult entertainment venues, department stores, jewelers, and

13   supermarkets.  Funds from these accounts were also used to

14   purchase at least four automobiles, gasoline station purchases,

15   and automotive maintenance."

16        He goes further in paragraph 23.  I'll just read you

17   the first sentence.

18        Actually, I'll read the entire thing into the record

19   if that's okay.

20        THE COURT:  You don't need to.  It's in the record.

21        MR. RICHARDSON:  Okay.  But basically paragraph 23

22   says there's no documentation that any of the money was used for

23   charitable purposes, nor is there any information that shows any

24   charitable functions ever happened.

25        THE COURT:  I recall.

1           MR. RICHARDSON:  So my point being, if we release the

2      $35,000, we know what's going to happen.  He's going to spend

3      it.

4           To answer your question to him, why does he need it,

5      well, because he needs it to live on, he needs it not for

6      charitable purposes.  And I'm confident that if the temporary

7      restraining order is lifted or if the permanent injunction is

8      not entered, he will spend that money in posthaste.

9           THE COURT:  Well, and since this money was donated to

10     a charitable organization, it shouldn't be used, anyway, to pay

11     for the attorney -- your attorney, Mr. Zamani.

12          MR. ZAMANIZADEH:  Your Honor, according to the

13     document that I provided, I believe that is the measure -- the

14     investigator declaration was made biased to the point that the

15     company didn't start in 2016, didn't end in 2017.  The company

16     started in 2007, 2012 added the nonprofit organization.  I have

17     loaned to the company, and just like any other company or

18     nonprofits, the directors have the employment agreement.

19          If the company -- I have been putting money in the

20     company, and if I have to take any money -- yes, there was

21     mistaken accounting and so forth, and that has been corrected

22     since then.  We have provided all the tax -- all the banking,

23     all the accounting correction, and everything that has been

24     taken has been counted as the payment on a zero interest loan

25     that I have given to the company with documentation to the

1   attorney general office.

2           However, I believe based on the biased intent of the

3   attorney, Mr. Richardson, and the plaintiff, a specific question

4   has been asked in this measure, he put in there what he had

5   seen, however, he had not stated that where did the other funds

6   come in from the beginning.

7           THE COURT:  I understand.

8           Let me ask you, Mr. Richardson.  I didn't bring the

9   whole file with me right now.  Could you refresh my memory as to

10  the causes of action that are alleged in the complaint?  Not the

11  facts, just the -- basically the names or the causes of action,

12  the descriptions.

13          MR. RICHARDSON:  And, Your Honor, I apologize.  I'm

14  going to have to go off memory.  I don't think I have my

15  complaint.

16          THE COURT:  Mary, do you have your computer up?

17          MR. ZAMANIZADEH:  Your Honor, are you asking for the

18  complaint, the original complaint?

19          THE COURT:  Complaint.  Yes.

20          MR. ZAMANIZADEH:  I believe I have one.

21          THE COURT:  Mary, could you borrow Mr. Zamani's

22  complaint?  I'll give it right back to you.

23          MR. ZAMANIZADEH:  Original complaint.

24          MR. RICHARDSON:  I think it's fraud and unjust

25  enrichment.  But without it in front of me, I hate to --

1          THE COURT:  That's fine.  Let me just double check.

2          Mary, you can give it back.

3          Yeah.  It's fraud and unjust enrichment, which carry

4    jury trial rights.

5          And I do think that Mr. Zamani is right when he says

6    that there's two sides to a story and he deserves a right to be

7    heard.  And so what I think we need to do is figure out when to

8    get you two to a trial.

9          Now, if Mr. Zamani wants to have a lawyer hired, then

10   I'll need to set a trial after I speak with your lawyer, make

11   sure it's an appropriate date for your lawyer.  If you want to

12   represent yourself at the trial, you have a legal right to do

13   that.  It's not a good idea for anybody.

14         MR. ZAMANIZADEH:  Your Honor, I'm not an attorney and

15   I do not intend to do that.  And on top of that, there's a

16   company involved, and I cannot represent the company.

17         And I have found attorneys.  However, I have to be

18   able to pay the retainer.

19         Mr. Calderbank, I asked for the retainer I provided.

20   And if I may just interject this one.  The complaint was filed,

21   Your Honor, in February.  I retained Mr. Calderbank and his law

22   firm on or about just about two weeks after that.  It took him

23   eight months to file an answer.

24         Same thing with this Mr. Richardson indicated that

25   when the TRO was filed we had two weeks, he has not done

1    anything.  When we came to your original hearing here, he just

2    had the documentation to file where we were -- we proposed to

3    have a settlement.

4            It's not that we have deviated -- Your Honor, the fact

5    of Mr. Richardson making this that, hey, you know, you're

6    stealing money from my clients, the fact should be decided in

7    court and in front of a jury.

8            THE COURT:  I agree.

9            MR. ZAMANIZADEH:  I have -- but tying my hands,

10   Your Honor, not to be able to retain an attorney, not to be able

11   to fight and basically provide all my facts to defend against

12   the allegation that plaintiff has brought in, FBI issues and

13   Department of Justice, basically is sandbagging this whole case

14   by tying my hand in order to win and then say, okay, well, you

15   know, we won it.

16           THE COURT:  Well, the only hands that I'm tying are

17   hands that would basically be trying to spend money that

18   originate from the plaintiff or are traceable to the plaintiff.

19           If you've got money that does not originate from Ms.

20   Torres or it's not traceable back to her, my order doesn't

21   interfere with that at all.  If you have other money coming in

22   from your business, I'm not -- or other businesses, I'm not

23   interfering with that.

24           But I think what -- not I think.  Here's what we're

25   going to do.  I'm going to enter the preliminary injunction now,

1    but I will allow you, through your attorney, whenever you want,

2    you may ask me to modify it, to lift it, to dissolve it.  All

3    you have to do, then, is present to me good legal arguments and

4    a factual basis and I will consider that.

5            MR. ZAMANIZADEH:  Your Honor --

6            THE COURT:  One moment.

7            In addition, I don't intend to let this case drag on

8    for a long period of time.  That probably will hurt both sides.

9            So as soon as you get an attorney, have your attorney

10   contact Mr. Richardson and my courtroom deputy -- or,

11   Mr. Richardson, if the attorney contacts you, tell the attorney

12   that I would like you to contact my courtroom deputy, we'll get

13   on the telephone together and we'll set a trial date.

14           This is not that complicated of a dispute.  Mr. Zamani

15   is right.  There's two sides to every story.  He is entitled to

16   his day in court.  We're going to get a jury in here and we're

17   going to resolve the dispute with a jury trial.

18           To the extent that my order does place a little bit of

19   pressure on Mr. Zamani with respect to the funds, so be it.

20           I'm sorry, sir, but I think it's the fair result given

21   the only thing I'm really tying you up on is funds that

22   originate from or are traceable to Ms. Torres.  Until we decide

23   whether she's entitled to those monies or your nonprofits are,

24   we're going to preserve them.

25           MR. ZAMANIZADEH:  Your Honor, if I may ask, with all

1    respect to the Court, if I can just have my Care Option account

2    which has nothing to do with the adult care, has a minimal

3    amount, so it can allow me to spend for my attorney's retainer,

4    that would be sufficient for me.

5           THE COURT:  How much do you need for your attorney's

6    retainer?

7           MR. ZAMANIZADEH:  Your Honor, every attorney that I've

8    met, they want 5,000 retainer to even discuss this.  I have

9    found an attorney and they are waiting right now to -- for me to

10   go and give them a call and say what is -- are they able to

11   get -- even Mr. Calderbank, when I asked him to refund the

12   retainer, he goes he cannot do it because it's -- it might be

13   under the TRO.

14          THE COURT:  All right.  Well, I will add to the TRO

15   the following:  That since your attorney has withdrawn and since

16   that money has already been sent to him anyway, I think it's not

17   inappropriate to say that any retainer that should be refunded

18   may be refunded not subject to the TRO or preliminary

19   injunction.  That way you can then use that retainer for a new

20   attorney.

21          Mr. Richardson, if you want to object to that, you

22   may, but that's pretty much the way I'm likely to go.  That

23   money is already gone anyway.

24          MR. RICHARDSON:  Your Honor, I would object to it for

25   one good cause for you to consider.

1          I have spoken with an attorney of Mr. Zamani's from

2    years ago not related at all to this case, and I think that

3    attorney is owed a bunch of money as well, and he indicated that

4    just to be careful, that Zamani is sophisticated and he knows

5    one way to hide money is to put it into a trust account.

6          So I would just ask that there be maybe a dollar

7    limit.  You know, if there's fifty- or a hundred thousand

8    dollars in Mr. Calderbank's account -- I don't know if that's

9    possible, but it seems like some sort of limit to say, okay,

10   here, you can hire your new attorney now, you should be

11   generating your income at some point and not using my client's

12   money to fund your defense.

13          THE COURT:  Let me ask you, Mr. Zamani, how much money

14   approximately is available from your attorney if I were to allow

15   your attorney to return it to you?

16          MR. ZAMANIZADEH:  Your Honor, it's $5,000 retainer,

17   and I would appreciate if your court -- Your Honor issue an

18   order to Mr. Calderbank to return that money to me since he

19   hasn't really done anything for me.

20          THE COURT:  I don't think I have jurisdiction over

21   Mr. Calderbank on that.

22          But I will say that as part of my preliminary

23   injunction order, that Mr. Calderbank, if he holds a retainer,

24   that retainer may be returned to the defendant without being

25   subject to the preliminary injunction up to a limit of $5,000.

1    And since you tell me that's what he has, that should be enough.

2            All right.  And as I said, once you get a new

3    attorney, if you want me to -- if your attorney and you want me

4    to reconsider any portion of this preliminary injunction, you

5    have leave to ask and I will consider it on the merits.

6            More importantly, though, if you want to get to a

7    trial sooner rather than later, have you and your attorney

8    contact my courtroom deputy and we'll get you a trial date.

9            If you decide you want to do this representing

10    yourself, speak with Mr. Richardson, let my courtroom deputy

11    know, and we'll get you a trial date and you can represent

12    yourself.

13            MR. ZAMANIZADEH:  If I may ask.

14            THE COURT:  You may.

15            MR. ZAMANIZADEH:  Your Honor, is it possible to have

16    Adult Care -- a search -- Adult Care Search -- Care Option, the

17    account which has $5,000, to be accessible for the attorney's

18    retainer in case Mr. Calderbank tries to hold off and tries

19    to -- which I asked repeatedly in e-mails that I need that and

20    he keeps telling me that, you know, he wants to do an accounting

21    and so forth and so -- I have all the e-mails, Your Honor, here.

22            THE COURT:  I don't want to take any current money

23    that is frozen on these accounts and unfreeze them, at least not

24    without hearing from your attorney.  I think that if your

25    attorney is willing to give you back the retainer, if his only

1  concern is that it may be subject to this preliminary

2  injunction, we'll make it clear that it is not.  If he's not

3  willing to give you back your retainer, call the Oregon State

4  Bar.  They may be able to be of assistance to you.

5          But I'm not going to release -- unfreeze any of the

6  money that's currently in these accounts at this time.

7          MR. ZAMANIZADEH:  Am I correct to understand,

8  Your Honor, that any income of the company that has come in that

9  is not related or traceable back to Mr. -- to plaintiff is not

10  subject to the TRO?

11          THE COURT:  Well, I would say any new income that you

12  earn that is not originating from or traceable to the plaintiff

13  is not subject to the TRO provided that they don't come in to

14  the 6923 account, the 2074 account, or the 3236 account.  Those

15  are frozen.

16          So if you're going to be getting new money in, which

17  will obviously not be coming from the plaintiff, they should

18  come into a different account.

19          MR. ZAMANIZADEH:  Okay.

20          THE COURT:  All right.  Do let me know as soon as you

21  get an attorney.

22          MR. ZAMANIZADEH:  Yes.

23          THE COURT:  Do let me know as soon as you want to

24  schedule a trial -- I don't think this will be a particularly

25  long trial -- and I will do my best to get it timely scheduled

1   so as to not cause further delay or undue expense to either

2   side.

3              MR. ZAMANIZADEH:   Thank you very much, Your Honor.

4              THE COURT:   Thank you, all.

5              MR. RICHARDSON:   Thank you.

6              MR. ZAMANIZADEH:   Appreciate it.   Thank you.

7

8        (The proceedings concluded at 3:47 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I certify, by signing below, that the foregoing is a

4   true and correct transcript of the record, taken by stenographic

5   means, of the proceedings in the above-titled cause.  A

6   transcript without an original signature, conformed signature,

7   or digitally signed signature is not certified.

8

9          DATED this 20th day of February, 2018.

10

11

12                              _____

13                              RYAN WHITE
                                Registered Merit Reporter
                                Certified Realtime Reporter
14                              Expires 9/30/2019
                                Washington CCR No. 3220
15                              Expires 10/25/2018
                                Oregon CSR No. 10-0419
16                              Expires 12/31/2020

17

18

19

20

21

22

23

24

25